# The People on the relation of Alonzo M. Keeler v. George W. Robertson.

*Quo warranto: Office: Election: Tie: Drawing lots.* A trial by lot under the
statute (*Comp. L. 1871,* § *186*) providing for drawing lots for office in case it
appears from the legal canvass of votes that two or more persons have received
an equal number of votes, and that a failure to elect is caused thereby, does
not preclude the inquiry by the attorney general, on the relation of the losing
party in the drawing, into the legality of the votes counted by the board of
canvassers for the respondent.

KEELER v. ROBERTSON.

*Drawing lots for office: Statute construed: Filling vacancies: Constitutional law.*
This statute cannot be construed as a regulation under the power granted to the legislature by the constitution (*Art. III.*, § *37*), to declare and fill vacancies; it applies to cases where no vacancy in fact exists; and the power given is subject to an express qualification excluding its exercise in cases where the constitution makes provision for filling vacancies; and such provision is made (*Const., Art. X.*, § *3*) in the case of registers of deeds.

*Statute construed: Drawing lots: Certificate.* The terms of the statute, when fairly considered, do not manifest an intent that the result reached by the board of canvassers, when followed by a formal drawing, shall be conclusive upon the candidates and the public; and the effect to be given to a certificate granted under this statute is no greater than that which is given to a certificate of election in other cases.—CAMPBELL, J., dissenting.

*Quo warranto: Practice in supreme court: Issues sent down for trial.* Where an issue under proceedings in the nature of a *quo warranto* has been sent down for trial, the case remains throughout as an original cause in the supreme court, and the verdict and proceedings on the trial, when certified up, will be subject to the same rules as apply in any court when judgment is moved for on a *nisi prius* record.

*Office: Quo warranto: Burden of proof: Title: Relator: Respondent.* In such proceedings the burden is on the respondent to justify his own title,—that of the relator being a collateral issue; and a judgment of ouster will be rendered against a respondent who shows no title, whether the relator's title prevails or not.

*Verdict: Rules of construction.* The whole verdict of a jury must be construed together, and general findings or conclusions inconsistent with special findings will be disregarded as wrong conclusions upon facts found.

*Verdict: Pleadings: Judge's notes.* A verdict must always be read in the light of the pleadings, and when it refers to documents annexed to it, they must be regarded as incorporated in it; and if not annexed, the verdict may be aided by the judge's notes, where they will suffice for that purpose.

*County canvass: Returns.* When the right of a respondent is referred by a verdict entirely to the county canvass, and the verdict finds facts which invalidate the returns on which it was founded, the canvass is thereby prevented from being conclusive.

*Office: Title: Ballots: Returns: Evidence.* The ultimate determination of a right to an elective county office is by the ballots themselves. But the law makes certain official counts and returns presumptive evidence of the number of votes cast, and such official counts will prevail, if lawfully and regularly made, until overthrown by count of the ballots.

*Ballots: Official count: Evidence: Certificate.* But an official count not legally made is void, and can neither be received in evidence, nor made the ground of an official certificate or return.

*Elections: Statute construed: Counting of ballots.* The only official count of ballots permitted by the election laws must be made publicly and the result announced publicly when the statements have been examined and the count completed, immediately after the closing of the polls. This result is the only one which can lawfully be certified, and the ballots must be sealed up as soon as the count is closed and the result determined and published. It is unlawful thereafter to open the ballot-box, except under the direction of the court upon a trial, and any other opening or count based thereon will be illegal for all purposes.

*Public announcement of result: Certificate: Subsequent recount.* The public declaration of the count is an official act and will prevail over any statement or certificate founded upon a subsequent and unlawful recounting.

*Ballots: Slips.* Where a slip is pasted over a name so as to partially obliterate it, the slip should be counted.

*Contested elections : Evidence : Ballots.* Where a contest arises upon an election, the most satisfactory evidence should be produced, and the course taken in this case, of not resorting to the ballots, was commented on.

*Heard on demurrer April 15. Decided April 22. Heard on verdict July 13. Decided July 22.*

Information in the nature of a *quo warranto.*

*Byron D. Ball, Attorney General,* for the People.

*Edgar Weeks, E. W. Meddaugh* and *A. B. Maynard,* for the relator.

*R. P. & J. B. Eldredge, Hubbard & Crocker* and *A. C. Baldwin,* for the respondent.

GRAVES, J.

This is an information brought to try the right to the office of register of deeds for Macomb county.

By his plea the respondent set up that at the late general election, himself and the relator were opposing candidates for the office; that four thousand eight hundred and ninety-seven votes were cast for it, of which nearly the whole number were equally divided between them by the actual count and determination of the board of county canvassers, and that thereupon lots were drawn by relator and respondent, in which proceeding the latter won and was furnished with a certificate of election. The plea assumed to detail the proceedings at length, but they need not be recited here. The relator filed a replication to the plea, and asked that certain issues said to be involved should be sent down to some proper county for trial. The suggested issues, looked to an inquiry into the legality of votes counted by the board of canvassers on the side of respondent. The latter demurred to the replication, and insisted that by the law of the state the canvass and proceeding by the board, with the decision by lot and the certificate awarded to him, were and are conclusive, and exclude all inquiry into the validity of the votes cast.

The question thus raised is important, and has received deliberate attention. The law which provides for drawing lots by competitors for office, declares "that whenever in elections of members of the state legislature, or county officers, it *shall appear*, on the legal canvass of the votes, that two or more persons have received an equal number of votes, and that a failure to elect to any office is caused thereby, such persons shall draw lots for election to such office in the manner following," etc.—*Comp. L., 1871,* § *136.*

The course to be pursued by drawing slips marked "elected" and "not elected," is then pointed out, and the act proceeds to declare "that any person drawing a slip in which is written the word 'elected' shall be *deemed legally elected* to the office in question; and the officer conducting such drawing shall forthwith give him a certificate of such election." The remaining portions are unimportant to the present inquiry.

The respondent was understood as arguing that the relator having participated in the drawing, and having lost, he ought to be precluded from going behind that process and the canvass. That the trial by lot being admissible only when the votes are found to be equally divided, his engaging in the drawing ought to estop him from asserting that the lawful votes were not so divided. He was further understood as insisting that the legislature being authorized by the constitution to declare when an office shall be deemed vacant, and also the manner of filling the vacancy, the law for drawing lots is to be considered as a regulation on that subject, and as contemplating the office as vacant in case of an equal division of votes, and as giving a method for filling it.

The relator's position was understood to be, that the drawing was intended to go no further as respects the right to investigate the legality of the election than to place the successful candidate in the same situation he would occupy if holding a certificate of election issued upon a count terminating in his favor.

Whatever opinion may be entertained by different gentlemen as to the mere personal propriety of going back to contest the validity of an election, by one who has actually engaged in a drawing and lost, it appears to me that when an information is filed by the attorney general to inquire for the public into the right, though on the relation of the losing party in the drawing, it is not admissible to say that the inquiry shall be closed in consequence of the relator's connection with that drawing. The office is created for the public advantage, and not to provide emolument for an individual, or to be owned and dealt with as mere private property. One, it is true, may be lawfully entitled to fill it, and have a valid right to its fruits. He may have a title which will exclude the legal claims of others; but his relation to the place as a candidate or aspirant is not such as to overbear the public right or such as to so far identify him with that right or clothe him with a capacity to represent it that his personal doings in a trial of chance under the statute will foreclose the state.

The primary and general right must remain paramount, and until some agency duly representing it and competent to bind it, has intervened in a way to preclude investigation, the course of judicial inquiry must continue open.

The second ground advanced by the respondent is next to be considered. That ground is, as before stated, that the canvass and drawing constitute in the given case an operation in view of the statute where a vacancy is ascertained and filled.

In the first place it must be noticed that the law necessarily applies to cases where no vacancy in fact exists, and where the winning candidate can find no place open to him at the time. The lot is to take place whenever an equal division of votes appears, and is to be made soon after the election and immediately after the canvass. It applies to general elections and elections for full terms. And these terms commence on the first day of January next after the election, and not earlier, and the old

officer is therefore in when the drawing occurs, and his term will go on until the end of the year. The person, then, who draws the office for a regular term cannot be entitled to enter and hold until some time afterwards, as the office is then full. Again, the language of the act is not appropriate to any such design, and neither the nature of the thing, nor the course of legislation favors the idea that the act was meant to be a regulation under the power to declare vacancies and fill them. No other result is per-missible without imputing very gross absurdity to legisla-tion. Specific regulations of a different kind are made for filling vacancies. And a number of acts have been passed at different times expressly directed to the subject of vacan-cies and the way of filling them.

By *section 582, Comp. L.*, it is expressly provided that in case of a vacancy in the office of register of deeds his deputy shall perform the duties of his office during the continuance of such vacancy; and the next section pro-vides that when there is no deputy, or he is unable to per-form the duties, the judge of the circuit court or county judge may appoint for the time being. These citations are made not to show that the regulations are valid or other-wise, but to show what the legislation has in fact been on the subject. We see here that the legislature really acted upon the subject, and we notice that in doing so express reference is made to the existence of a vacancy. The meaning is not left to a doubtful or unnatural implication.

*Chapter eleven of the Compiled Laws* is also expressly applicable to vacancies and the mode of filling them. Indeed, the specific regulations on this subject are numer-ous, and they manifest that the act for drawing lots could not have been intended to cover any part of the same object.

But the argument supposes this statute to be in subser-vience to the before-mentioned constitutional provision, and it may be well to see, therefore, whether that provision was meant to allow the legislature to fill a vacancy in the office

27 MICH.—16.

of register of deeds in this way.    It is in these terms:
"The legislature may declare the cases in which any office
shall be deemed vacant, and also the manner of filling the
vacancy, where no provision is made for that purpose in this
constitution."—*Const.*, *Art. III.*, § *37.*

We observe that the power given by this particular sec-
tion is subject to a qualification plainly stated in the sec-
tion itself, and that such qualification excludes the power
in cases where the constitution makes provision for filling
vacancies.    If, then, we find a provision elsewhere in the con-
stitution for filling a vacancy in the office of register of deeds,
it cannot be said that the power to regulate that subject
resides in this clause.    And there is such other provision.

*Section 3 of Article X.* declares that "In each organized
county there shall be  *  *  a register of deeds,  *  *  *chosen*
by the *electors* thereof once in two years, *and as often as
vacancies shall happen,*" etc.

It is, therefore, obvious that the law for drawing lots
cannot safely be referred to any such theory as that insisted
on by the respondent.    The clause in the constitution on
which that theory is made to rest, will not bear the con-
struction which the theory requires.

Is the law rightly subject to any other view which will
make it operate so as to shut out a judicial investigation
of the legality of the proceedings prior to the canvass and
drawing?    If it is, it must be because the terms used,
when fairly considered, manifest an intent that the result
reached by the board of canvassers, when followed by a
formal drawing, shall be conclusive upon the candidates,
and also upon the public.    Is such an intent manifest?
In looking at the question we are still to remember that
the end aimed at by the institution of these offices is the
public benefit, and not the advancement of the personal
interests of individual aspirants, and that the choice to
such offices as that in question for regular terms belongs
primarily to the whole body of legal voters of the county.

The board of canvassers has no authority to go behind

the statements returned by the election boards, and inquire into the qualifications of the persons whose votes are returned. They have to proceed in making their count, upon the data furnished by the returns or statements, and are compelled to assume that the votes returned as having been given were legal votes. As then the board do not and can not go into the question whether the votes returned were cast by qualified persons, their decision can-not involve or decide that question; and if their decision that the vote is equally divided carries with it a power to decide the result by chance which will conclude all inquiry into the validity of the votes canvassed, then important offices are by law made subject to be filled through illegal votes, against the right of the public, and without the possi-bility of investigation anywhere or by any lawful means. The simple fact that two or more appear upon the returns to the board of canvassers to have received an equal num-ber of votes, results in completely excluding the public, as well as individuals, from all inquiry into the validity of the votes going to produce such apparent equal division. No matter what irregularities may have actually occurred in the doings by or before the primary election boards, if the papers and records are regular on their face, all investiga-tion is precluded by the circumstance that it appears on a count by the board of canvassers that the vote is equally divided.

Now, it will be admitted that if it appears upon the can-vass that any candidate has a greater number of votes by one than any others he is entitled to a certificate of elec-tion, and as fully entitled as though he had drawn the winning slip on an apparent equal division of votes. And it will also be admitted that the certificate in such case cannot exclude judicial investigation. If, however, the claimed construction of the statute is correct, a smaller vote by one in the returns for the same place, and followed by a winning cast, will inure to give him the office securely against his competitors and against the people, no matter

how many fraudulent or illegal votes may have served to swell his side of the list. Yet there is nothing in the nature of the case or in reason or policy which can furnish ground for any such distinction. It is extremely difficult to suppose that the legislature intended any such consequences, and the terms of the law do not compel an interpretation which will produce them.

The drawing is provided for when it *"appears"* on the canvass made pursuant to law, that two or more persons have received an equal number of votes, and that a failure to elect is *"thereby"* caused, and the person who draws the winning slip is, in the language of the act, to be *"deemed legally elected."* The meaning of this appears to be that when, in consequence of an equal division upon the returns, the board cannot declare in favor of any one, the difficulty shall be settled by chance, so as to allow a certificate to be issued to some one. The act is not worded as we should expect to find it if the legislature had intended to make the result final and conclusive. If a result so far-reaching and unusual had been designed, it is scarcely credible that it would have been left in any uncertainty.

The most natural inference upon the whole is, that the plan adopted was meant to go no further than to give the same effect to a certificate fairly granted to one regularly entitled upon a legal drawing, that belongs to a certificate of election in other cases. Such an inference does no violence to the terms of the act, and, on the other hand, it places the sanctity of the title obtained in such a mode, on a level with one acquired by certificate founded on the apparent larger vote. And it likewise leaves the right of the public to look into the validity of the anterior proceedings, in all its integrity. If this conclusion is well-founded the demurrer must be overruled.

CHRISTIANCY, CH. J., and COOLEY, J., concurred.

CAMPBELL, J.

I think the language declaring that the person allotted to be the incumbent shall be *deemed* legally elected is too positive to be read as if it said "*presumed.*"    There is nothing which would render such a rule unreasonable, and there are many considerations recommending it.    At that stage of proceedings no one can know, and certainly the law cannot presume, that there has been a miscount.    There is always a presumption that officers have acted fairly, and their count of single ballot-boxes is as likely to be correct as when the votes in a large number are counted before a jury, with no likelihood that a miscount in so large a mass will be detected.

The language should, I think, receive its natural meaning.

An issue having been framed and sent down to the Macomb circuit for trial, the verdict and proceedings were certified to this court, and came on for hearing at the July term, upon a motion by the relator for judgment upon the verdict.

*Edgar Weeks* and *A. B. Maynard,* for the motion.

*R. P. Eldredge* and *A. C. Baldwin, contra.*

CAMPBELL, J.

This case comes up on motion for judgment on the verdict.    It is claimed by each of the parties that the verdict, as it stands, is in his favor.

On the present motion we are confined to the record, and can take no notice of any special rulings on the circuit which might be the ground of moving for a new trial. But the case does not stand before us like a case on error.

It is an original cause in this court; and we have the trial reported to us with the judge's notes, which enable us to do with it what might be done in any court moved for judgment on a *nisi prius* record.

The difficulties which arise on the verdict are twofold: *first*, a supposed conflict between the general findings and the answers to particular questions; and, *second*, a supposed failure in the special findings to determine any matter which would change the general findings.

If the two findings on the two separate issues, which are the only ones raised on the replication, stood alone, they would be conclusive. They find the only issues laid before the jury, in favor of the respondent. And, as both parties are confined to those issues, this would have ended the controversy, unless a new trial were granted.

But, whether the jury could or could not have been required to find specially on any point, they have done so; and their finding must all be taken together. If there is any thing in the special findings which is so opposed to the general conclusions as to show they could not have been found on the record without contradicting the special findings, then those conclusions must be disregarded, as they would be on a special verdict in the ordinary form. If, on the other hand, they can be reconciled with the special findings, they will be upheld.

It is necessary, therefore, to consider what were the precise issues, and what were the findings. In such cases as the present the pleadings are special, and not general.

The defendant, being called upon to show by what warrant he assumed to exercise this office of register of deeds for Macomb county, was compelled to disclaim, that is, to deny that he held or claimed the office; or else to justify, and show what title he asserted. He set up a title to the office, not as having received a majority of votes, but as having received a tie vote with the relator, which appeared on the canvass of the county, and was followed by a statutory allotment whereby he drew the office.

Upon the demurrer filed to the replication in this cause, it was held that the canvass was not conclusive, and that the issues presented by the replication might be tried. These both went to a denial of an actual tie, one denying that respondent received the number of votes asserted, and the other denying that respondent received as many votes as the relator.    The only issue, therefore, related to whether the returns on which the canvass was made were authentic as to the number of votes cast for both candidates, as the canvass itself was not put in issue, and the proceedings to determine between the claimants under a tie vote were also not impugned.

The findings are in substance as follows:

1. That respondent received the number of votes alleged.

2. That he received as many as relator.    These are the general findings.

The special findings are on relator's requests:

1. That in the town of Sterling the inspectors, on the day of election, canvassed the votes, made known the result to the electors present, that result being a majority of one hundred and twenty-one for respondent, sealed up the ballots and closed and secured them in the ballot-boxes, and then separated and went to their own homes, without adjournment.

2. That afterwards, on the 7th day of November, 1872 (the election having been on the 5th), the inspectors met again without previous adjournment, opened the boxes, recounted the votes, and made their return, which was antedated as of November 5th.

3. That a vote was thrown out by the inspectors where a slip for relator had been placed over the name of respondent, and partially obliterated it.

The findings on respondent's requests were:

1. As to how many legal votes respondent received. "We find, according to the county canvass, that is, 2411."

2. As to legal votes for relator.    "We find, according to the county canvass, that is, 2411."

They find further a tie and the drawing of lots result-

ing in favor of respondent, which latter was not in issue on the pleadings, but admitted.    As to whether there was any fraud in Sterling they cannot tell.

A preliminary question arises on the extent of the verdict, and also upon the burden of the issue.    In these cases the defendant is called upon to justify his title, and if the facts do not show his title, he must be ousted, whether they make out that of the relator or not.    The relator's title is a side issue, which is usually passed upon, but not always.—See *People v. Molitor, 23 Mich., 341; People v. Miles, 2 Mich., 348; People v. Connor, 13 Mich., 238.*

In regard to the findings, it is undoubtedly true that they must lead to one result or another, or the verdict will be insufficient.—*People v. Doesburg, 17 Mich., 135.* But a verdict is always to be read in the light of the pleadings; and where it expressly refers to documents before the jury, the omission to recite them at length in the verdict will be supplied, if it can be done by the aid of the judge's notes.    In the present case the county canvass and the return of the inspectors of Sterling are both sent up with and annexed to the finding, so certified as to make them documentary evidence, and they must be assumed as being in law a part of the verdict.—*Tidd's Pr., 897, et seq.*

We think the fair construction of the verdict is, that the conclusions of the jury were based on the county canvass, and that they did not regard the transactions in Sterling as affecting its correctness.    Upon looking into the report of the judge we find nothing to indicate a different meaning, and every thing to confirm this.    We find no evidence of any counting of ballots before the jury, and that the whole controversy was made upon the various countings in that town.    As the county canvass was based entirely on the official returns, the only question on this verdict is, whether they have been so affected by the finding as to change the result against respondent.

The election law is positive that the official count of

the ballots shall be made immediately, in public, and the result ascertained and declared publicly, and an official statement made of the result in duplicate, one to be delivered forthwith to the town clerk, and the other given to the inspector who is to attend the canvass; and the ballots are then to be sealed up and delivered to the clerk, and kept unopened until the next election, subject only to inspection on a contested election.—*Comp. L., p. 116–117.*

This statute is not doubtful. It makes the action of the inspectors final when they have finished their count and sealed up the ballots, all of which the law requires to be done without delay, in public. Every opening of the ballots thereafter, except upon an election contest, when they will be needed in court, is an unlawful act, and cannot be made the basis of official action.

The ballots are primary and the best evidence. Usually, therefore, secondary evidence would be excluded. For purposes of convenience the law has provided that the action of the inspectors, when conforming to the statute, shall stand as presumptive evidence of their contents. But evidence by the count of any one not made officially, and not made in presence and under the eye of a jury, would be hearsay at best. But it would be contrary to public policy to allow any evidence whatever, based upon a counting made in direct violation of law, to be received at all. The object of the statute is to prevent tampering with the ballots, and inasmuch as it would be impossible to determine with certainty whether any fraud had been committed in any unauthorized counting, there can be no propriety in allowing any evidence resting on it.

If there had been no re-counting, the fact that the statement was not made at once would not, perhaps, be very material, inasmuch as defective statements are allowed to be amended.—*Comp. L.,* § 77. But no statement would be valid which was not based on the original count. made before the ballots were closed up, and declared publicly when made. This public declaration is as much an offi-

27 MICH.—17.

cial act as the counting of the votes, and should not be made until the statement of the votes is finally concluded upon, so as to leave no further work to be done except putting it in the form of an official certificate.

The verdict, then, read in connection with these documents, shows that in regard to the office in controversy the return does not conform to the first counting, and that the vote for the respondent upon that counting would be less than that for the relator. It also shows that the return, so far as this office is concerned, is based on a counting not official, but unauthorized, and therefore raising no presumption of correctness. In the absence of other proof the official declaration of the result, made on election day, is the only evidence we have of the vote upon register, and upon that the relator must prevail.—*People v. Cicott*, *16 Mich.*, *283.*

The finding in regard to a rejected vote also appears to show that relator should prevail, even if the return had been valid. The slip pasted above respondent's name, so as to partially obliterate it, should have been counted for relator, as it could leave no doubt as to the intent, and could not make a double vote. It came within the principle of the same case.

As we consider relator entitled to the office upon the verdict, we need not consider the rulings further than to say that any review of them would not change the result in favor of respondent.

But we deem it proper to say that when an election is contested upon the votes, there is great impropriety in omitting to introduce the best evidence accessible, which was not done in this case on more than one point.

Judgment must be rendered against the respondent and in favor of the relator, with costs.

The other Justices concurred.