HORNING *v.* BOARD OF CANVASSERS OF SAGINAW CO.

119   51
f148  515

ELECTIONS—BALLOTS—INSPECTOR'S INITIALS—PLACE OF INDORSEMENT—DIRECTORY PROVISIONS OF STATUTE.

> The provisions of the election law (Act No. 190, Pub. Acts 1891) requiring the inspector (section 22) to write his initials upon the upper left-hand corner of the ballot, and declaring void (section 36) all ballots "not indorsed with the initials of the inspector as provided in this act," do not authorize the rejection by the canvassers of ballots inadvertently indorsed by the inspector in the lower right-hand corner; so much of the statute as designates the particular place for the indorsement being directory only.

*Certiorari* to Saginaw; Wilber and Snow, JJ. Sub-

mitted December 13, 1898.   Decided December 21, 1898.

*Mandamus* by Washburn Horning to compel the board of canvassers of Saginaw county to count certain ballots rejected by it as invalid.   From an order granting the writ, respondent brings *certiorari*.   Affirmed.

*L. E. Bradt* and *W. G. Gage*, for relator.

*James H. Davitt* and *George W. Weadock*, for respondent.

MOORE, J.   The relator, Washburn Horning, and James Creen, were rival candidates for the office of county treasurer of Saginaw county.   Upon the face of the returns, Mr. Horning had 101 majority.   Mr. Creen petitioned the board of county canvassers for a recount in a number of voting precincts, among which was the township of Chesaning.   The recount was granted.   The only question involved is whether a proper disposition was made of the votes of that township.   The returns from Chesaning show that 346 votes were cast for Mr. Horning, and 123 for Mr. Creen.   Upon the recount by the board of canvassers, 174 votes were credited to Mr. Horning from this township, and 53 votes to Mr. Creen.   The result of this action, if allowed to stand, would be to elect Mr. Creen.   Upon the petition of the relator, after a hearing, the circuit court for the county of Saginaw directed a writ of *mandamus* to issue to the canvassing board, directing it to reconvene and recount the ballots cast in the township of Chesaning, including the ones rejected by the board.   The board then filed a petition in this court for a writ of *certiorari* to have the order of the circuit court granting the writ of *mandamus* vacated.

The ballots which were cast in the township of Chesaning were all marked upon the back thereof with the initials of one of the inspectors of election.   Two hundred and thirty-nine of them were marked in the lower right-hand corner, instead of in the upper left-hand corner, as re-

quired by the provisions of section 22, Act No. 190, Pub. Acts 1891. All of these ballots were rejected by the board of canvassers, upon the ground that the marking in the lower right-hand corner constituted a distinguishing mark. One hundred and seventy of the rejected ballots were cast for the relator and sixty-nine for Mr. Creen. It is urged upon the part of respondent that the requirement that the inspector's initials shall appear upon the back of the ballot, and the place where they shall be placed, is mandatory, and not merely directory,— citing *Attorney General* v. *May*, 99 Mich. 538, 558, 559 (25 L. R. A. 325); *Attorney General* v. *McQuade*, 94 Mich. 439; 6 Am. & Eng. Enc. Law (1st Ed.), 348; *People* v. *Board of Co. Canvassers*, 129 N. Y. 395 (14 L. R. A. 624); *Sweeney* v. *Hjul*, 23 Nev. 409; *Ex parte Riggs*, 52 S. C. 298; *West* v. *Ross*, 53 Mo. 350, 355; *State* v. *McKinnon*, 8 Or. 500.

It is also said: " The electors whose votes were thrown out by respondents in their recount cannot complain if that action is affirmed. An elector who votes a ballot not bearing the initials of the inspector, as required by law, or bearing any other distinguishing mark, is bound to know that it will not be counted. Every elector must know that the law forbids counting ballots which bear distinguishing marks, either on the back or face. If a ballot improperly marked with the initials of the inspector is given to a voter, the latter is not bound to vote it, but he should demand a lawful ballot. He cannot blindly rely upon the inspectors,"—citing *People* v. *Board of Co. Canvassers, supra; Sweeney* v. *Hjul, supra.*

It is further stated: "The fact that a considerable number of votes must be thrown out cannot affect the application of the rule,"—citing *People* v. *Board of Co. Canvassers*, 129 N. Y. 414 (14 L. R. A. 633), opinion of Ruger, C. J.; *Attorney General* v. *Glaser*, 102 Mich. 401.

None of these cases is directly in point, but it is asserted the reasoning contained in them justifies the action of

the canvassing board.    We shall have occasion to refer to some of them later.

The provisions of the statute, so far as they relate to the initials, are as follows:

Section 22: ''The inspector so designated shall at once proceed to write his initials in ink on the upper left-hand corner of the back of each of said ballots, in his ordinary handwriting, and without any distinguishing mark of any kind.''

Section 26, as amended by Act No. 202, Pub. Acts 1893, provides:

''Before leaving the booth, the elector shall fold his ballot so that no part of the face thereof shall be exposed, and so that the initials of the inspector shall be on the outside thereof, and on leaving the booth shall at once deliver, in public view, such ballot to the inspector designated to receive the same, who shall thereupon announce audibly the name of the elector offering the same.   *   *   *   The inspector shall then, in the presence of the elector and the board of inspectors, deposit the same in the ballot-box without opening the same.''

Section 36 provides:

''In the canvass of the votes, any ballot which is not indorsed with the initials of the inspector as provided in this act, and any ballot which shall bear any distinguishing mark or mutilation, shall be void, and shall not be counted.''

The record shows that all the ballots which were rejected bore the initials of the proper officer.   To mark these ballots, the convenient and natural way would be to spread them before the inspector with face down.   The rejected ballots were doubtless put before the inspector with the bottom of the sheet where the top should have been, and, as so placed, were marked in the upper left-hand corner with the initials of the inspector.   This is shown by the fact that the upper part of the initial letters was next to the lower margin of the paper.   The record does not disclose that either the electors or the inspectors knew any mistake had been made in the marking.   When one of

the ballots was folded, it could not be told that the ballot was not marked in the upper left-hand corner. The ballots were voted and counted without their validity being questioned. There is nothing to indicate the inspector who marked them, or the electors who voted them, discovered they were not properly marked, or that there was any wrong intended by any one in connection with the transaction. Nor could it be told for whom any individual elector voted. Under such a state of facts, should the electors voting these tickets be disfranchised, and a man declared elected when fewer votes were cast for him than for his opponent?

In *Attorney General* v. *McQuade, supra,* and *Attorney General* v. *May, supra,* persons entered the booth with the electors, when they were not authorized to do so by the statute, and the secrecy provided by the law was violated. The inspector and the electors were both parties to the illegality. The cases do not aid in the solution of the questions involved in this case. The case of *West* v. *Ross,* 53 Mo. 350, was under a statute which required the ballots to be numbered, and which provided in express terms that ballots not numbered should not be counted. It would be in point if our statute provided that no ballot should be counted unless the initials of the inspector were in the upper left-hand corner; but it does not so provide. In the case of *State* v. *McKinnon, supra,* the elector cast a ballot which was upon colored paper, when the law required the ballots to be upon plain white paper, thus making the ballot easily distinguishable. The case of *People* v. *Board of Co. Canvassers, supra,* was one where there was a ballot for each party ticket, instead of having the tickets all printed upon one ballot, as our law requires. The indorsement on the back of the ballots enabled the inspectors to know what party ticket the elector voted. Three of the seven judges dissented from the majority opinion. One of the majority judges based his opinion upon the fact that he thought the evidence disclosed the law had been designedly violated. The court

refused to follow this opinion in the later case of *People* v. *Wood*, 148 N. Y. 142.

While it cannot be said the authorities are uniform, we think a distinction is made between the act of the electors and that of the inspector. In *People* v. *Bates*, 11 Mich. 362 (83 Am. Dec. 745), Justice CHRISTIANCY said:

"If the fraud of the voters, the ballots should not be counted; if that of the inspector, they should."

In *Lindstrom* v. *Board of Canvassers*, 94 Mich. 467 (19 L. R. A. 171), in construing section 36 of the act, it is said:

"The evident intent of this provision was to provide against voters' marking the individual ballot which they cast in such manner as to distinguish it."

In *Loranger* v. *Navarre*, 102 Mich. 259, it is said:

"The voter, finding the ticket upon the ballot, cannot be required to determine its regularity at his peril. This might involve a necessary knowledge of facts difficult to ascertain. He may safely rely upon the action of the officers of the law, who he has a right to suppose have done their duty."

In *People* v. *Avery*, 102 Mich. 572, it is said:

"The electors are not to be deprived of the result of their votes at an election by the mistake of election officers, when it does not appear to have changed the result."

In *Moyer* v. *Van De Vanter*, 12 Wash. 377 (29 L. R. A. 670, 50 Am. St. Rep. 900), this language is used:

"Many cases have been cited by counsel as supporting the positions taken by them, respectively, and many of these involve a consideration of various phases of the law commonly known as the 'Australian Ballot Law,' in force here, but which is a comparatively new thing in this country. These cases cannot all be harmonized, but the general trend thereof has been to recognize a clear distinction between those things required of the individual voter and those imposed upon election officers. There is a disposition to hold the former valid and mandatory; but where there has been a substantial compliance with the

law on the part of the individual voter, and it is made to appear that there has been in fact an honest expression of the popular will, there is a well-defined tendency to sustain the same, although there may have been a failure to comply with some of the specific provisions of the law upon the part of the election officers or some of them. Language may have been employed in some of the cases in conflict with this position; but, when such cases are examined with reference to the specific facts passed upon, it will appear that this distinction has been adhered to, and it may truly be said to be the one great underlying principle of all the cases.   In case of a violation of the law on the part of an election officer, punishment may be provided therefor, and in this way the law can be rendered effectual without going to the extent of depriving the voter of his right to have his vote counted, in consequence of such violation."

The rule is stated as follows in McCrary, Elect. (4th Ed.) § 724:

"The decisions cited in the preceding sections upon the question whether the provisions of the law are mandatory or directory are not entirely harmonious.   They, however, disclose a well-defined disposition on the part of the courts to distinguish between acts to be performed by the voters and those devolving upon the public officials charged with the conduct of the election.   The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and on the other of relieving him from the consequence of a failure on the part of election officers to perform their duties according to the letter of the statute, where 'such failure has not prevented a fair election. The justice of this rule is apparent, and it may be said to be the underlying principle to be applied in determining this question.   The requirements of the law upon the elector are in the interest of pure elections, and should be complied with, at least in substance; but to disfranchise the voter because of the mistakes or omissions of election officers would be to put him entirely at the mercy of political manipulators.   The performance by the election officers of the duties imposed upon them can be reasonably well secured by providing a penalty for failure so to do."

In *State* v. *Fransham*, 19 Mont. 273, it is held, where

electors vote the official ballots supplied to them by the judges of election, their legally-expressed will cannot be overthrown, where they are not at fault, by the fact that the public officer who prepared the ballots in some way neglected his duty.   See, also, *State* v. *Russell*, 34 Neb. 116 (33 Am. St. Rep. 625); *Cook* v. *Fisher*, 100 Iowa, 27.

The case of *Parvin* v. *Wimberg*, 130 Ind. 561 (30 Am. St. Rep. 254), is almost a parallel case to this.   The election law in Indiana is very similar to the Michigan law. This is especially true of the initialing of the ballots and the counting of the votes.   In that case the statute required the initials to be in the lower left-hand corner. They were inadvertently placed in the lower right-hand corner.   In holding that the ballots should be counted, the court said as follows:

"So, it has often been held by this court that a departure from the mode of holding an election as prescribed by statute, which does not deprive legal voters of their right to vote, or permit illegal voters to participate in the election, or cast uncertainty on the result, does not affect the validity of the election.   *Gass* v. *State*, 34 Ind. 425; *Lafayette, etc., R. Co.* v. *Geiger*, Id. 185; *Dobyns* v. *Weadon*, 50 Ind. 298; *Mustard* v. *Hoppess*, 69 Ind. 324; *Duncan* v. *Shenk*, 109 Ind. 26.   Judge McCrary, in his work on Elections (4th Ed., § 228), says: 'The principle is that irregularities which do not tend to affect the results are not to defeat the will of the majority.   *   *   * The officers of election may be liable to punishment for a violation of the directory provisions of a statute, yet the people are not to suffer on account of the default of their agents.'

"Section 34 of the election statute provides:

" ' At the opening of the polls, after the organization of, and in the presence of, the election board, the inspector shall open the packages of ballots in such a manner as to preserve the seals intact. He shall then deliver to the poll clerk of the opposite political party from his own twenty-five each of the State and local ballots, and to the other poll clerk the stamps for marking the ballots.   The poll clerks shall at once proceed to write their initials in ink on the lower left-hand corner of the back of each of said ballots, in their ordinary handwriting, and without any distinguishing mark of any kind.   As each successive elector calls for a ballot, the poll clerks

shall deliver to him the first signed of the twenty-five ballots of each kind; and the inspector shall immediately deliver to the poll clerks another ballot of each kind, which the poll clerks shall at once countersign as before, and add to the ballots already counter-signed, so that it shall be delivered for voting after all of those theretofore countersigned.'

"The sections following provide for the manner of conducting the election until the close of the polls.

"Section 52 provides:

" 'The board shall then proceed to canvass the votes, beginning first with the State ballots, and completing them before proceeding with the local ballots, by laying each ballot upon the table in the order in which it is taken from the ballot-box, and the inspector, and the judge of the election differing in politics from the inspector, shall view the ballots as the names of the persons voted for are read therefrom. In the canvass of the votes, any ballot which is not indorsed with the initials of the poll clerks, as provided in this act, and any ballot which shall bear any distinguishing mark or mutilation, shall be void, and shall not be counted; and any ballot or part of a ballot from which it is impossible to determine the elector's choice of candidates shall not be counted as to the candidate or candidates affected thereby.'

"It is not claimed that the failure of the poll clerks to indorse their initials at the place on the back of the ballots indicated by the statute constituted a distinguishing mark, for they were all indorsed alike, but the claim is that the statute is mandatory as to the place upon the ballot at which the initials shall be written. The purpose of construing a statute is to arrive at the intention of the legislature. For that purpose, the courts will look to the whole statute and all its parts, and, when such intention is so ascertained, it will prevail over the literal import and the strict letter of the statute; and, where the meaning is doubtful and uncertain, the courts will look also to the situation and circumstances under which it was enacted, to other statutes, if there are any, upon the same subject, whether passed before or after the statute under consideration, whether in force or not, as well as to the history of the country, and will carefully consider, in this connection, the purpose sought ,to be accomplished. *Storms* v. *Stevens*, 104 Ind. 46; *Stout* v. *Board of Com'rs*, 107 Ind. 343; *May* v. *Hoover*, 112 Ind. 455; *Board of Com'rs of Fountain Co.* v. *Board of Com'rs of Warren Co.*, 128 Ind. 295.

"A study of the statute upon the subject of elections leaves no doubt that its purpose is to secure a fair expression of the will of the electors of the State, by secret ballot, uninfluenced by bribery, corruption, or fraud. The disfranchisement of whole precincts by reason of an honest mistake on the part of election officers is inconsistent with this purpose. The immediate purpose of the provisions of section 34 is to prevent the counting of fraudulent votes, by requiring the poll clerks to indorse their initials upon the official ballots, to the end that they may be identified when taken from the ballot-box. This purpose is accomplished as well by the indorsement of such initials in one place as in another on the back of the ballot. Of course, so much of the statute as requires the ballots to be indorsed with the initials of the poll clerks is mandatory; but we are of the opinion that so much of the statute as requires the initials to be indorsed at a particular place on the back of the ballot is directory only, because the purpose of the legislature is accomplished when the indorsement is made in such manner as to enable the election officers, in conducting the count, to identify it as the official ballot.

"Judge Cooley, in his valuable work on Constitutional Limitations (6th Ed., p. 92), says: 'Those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly, and prompt conduct of the business, and by a failure to obey which the rights of those interested will not be prejudiced, are not commonly to be regarded as mandatory; and if the act is performed, but not in the time nor in the precise mode indicated, it may still be sufficient if that which is done accomplishes the substantial purpose of the statute.' See, also, *Martin* v. *Pifer*, 96 Ind. 245; *Middleton* v. *Greeson*, 106 Ind. 18; *In re Douglass*, 58 Barb. 174."

The indorsement of the initials was made in all respects as required by law, except that, instead of being in the upper left-hand corner, they were in the lower right-hand corner. The ballot, when folded, could not be told from a folded ballot with the initials in the upper left-hand corner. The inspectors of election did not intend to do any wrong. The electors were all qualified voters. They accepted the ballots as given to them by the inspector, supposing them to conform fully with the law. As voted, they were secret ballots. . No one of the 239 ballots was

distinguishable from the others.    The electors voted them in the utmost good faith, without objection or challenge from any one.    The inspectors counted them without protest from any source.    No one then supposed they were illegal or unofficial ballots.    No one knew of the mistake, or thought the election of any candidate was imperiled. The electors took as much precaution as any elector would be expected to take.    They were in no sense responsible for the mistake of the inspector.    To disfranchise hundreds of legal voters, for an unintentional mistake of this character by a public officer, is a gross injustice, and is calculated to bring a very commendable law into disrepute. It would enable a corrupt inspector to disfranchise the electors when they were not parties to any fraud.

The application to have the order of the circuit court vacated is refused, and the board of canvassers is directed to issue a certificate of election to the relator.

The other Justices concurred.