ATTORNEY GENERAL, *ex rel.* MILLER, *v.* MILLER.

1. ELECTIONS—PURPOSE—EFFECT OF FRAUD.

Primary object of an election is to enable voters of a precinct to express their choice of candidates, and while fraud on part of voter vitiates his ballot, fraud or mistake on part of election officials should not operate to defeat will of voter.

2. SAME—CONSTRUCTION OF STATUTES.

Statutes giving directions as to manner of conducting elections will be construed as directory unless noncompliance therewith is expressly declared to be fatal or affects an essential element of the election.

3. SAME—VOTE NOT VITIATED BY FAILURE TO USE OFFICIAL TALLY
SHEETS.

Failure of election officials to use the official tally sheets is not
a violation of the mandatory provisions of the statute, and,
therefore, vote of entire election precinct is not vitiated (1
Comp. Laws 1929, § 3155).

4. SAME—CORRECTION OF STATEMENT OF VOTE.

Relator in *quo warranto* proceedings is entitled to correction of
mistake made in the count of ballots on statement of vote in a
precinct where official tally sheets were not used.

5. QUO WARRANTO—JURISDICTION OF SUPREME COURT.

Information in nature of *quo warranto* filed in Supreme Court is
an appeal to its original jurisdiction as conferred by the Con-
stitution (Const. 1908, art. 7, § 4).

6. SAME—AMENDMENT OF INFORMATION.

Information in nature of *quo warranto* is treated as amended to
cover claimed illegality of election in entire precinct because
officers failed to use official tally sheets, where information was
filed in Supreme Court, although question should have been
raised by the pleadings.

7. ELECTIONS—PERSONS IN POLLING PLACE UNDER COLOR OF AUTHOR-
ITY.

Evidence *held*, to support finding of circuit judge upon reference
of *quo warranto* case for hearing, that presence of man, acting
with consent of election officials and under color of authority
to assist voters in and out of polling places was not improper,
where there is no showing that anything he did in any way
affected the result.

8. SAME—PURGING OF EXCESS BALLOTS.

Election officials are not called upon to purge the ballot box of
excess ballots pursuant to 1 Comp. Laws 1929, § 3153, where
there was no excess in fact although erroneous figures were
placed on wrappers put around ballots after they were counted.

9. SAME—ABSENT VOTERS' BALLOTS—FRAUD.

Record *held*, to amply sustain finding that no fraud was perpe-
trated in the voting of absent voters' ballots in a certain
precinct although statutory provisions were not followed where
it does not appear that any applicant therefor was not entitled
to such ballot and irregularities indulged in by both political

parties had been practiced in prior elections in that precinct (1 Comp. Laws 1929, §§ 3136–3138, 3141–3146, as amended by Acts Nos. 200 and 282, Pub. Acts 1931).

10. SAME—CONSTITUTIONAL LAW—STUDENT VOTERS.

Constitutional provision that no elector shall be deemed to have gained or lost a residence "while a student at any institution of learning" is clear and unambiguous (Const. 1908, art. 3, § 2).

11. SAME—REJECTION OF VOTES OF STUDENTS.

Recommendation of circuit judge to whom *quo warranto* case was referred for hearing, that whole number of votes cast by students at college located within an election precinct be rejected, under the circumstances, is adopted.

12. SAME—VOTES OF UNREGISTERED PERSONS.

Votes given by persons not registered in precinct where vote is offered are illegal and may not be counted (1 Comp. Laws 1929, § 2756).

13. SAME—MISTAKE OF ELECTION OFFICIALS.

Electors are not to be deprived of the result of their votes at an election by mistake of election officials when it does not appear to have changed the result.

14. SAME—REJECTION OF POLL—ILLEGAL VOTES—FRAUD.

Poll will not be rejected where it is possible to ascertain the number of illegal votes cast and no active or legal fraud is shown vitiating entire vote.

15. SAME—PROPORTIONATE REDUCTION FOR ILLEGAL VOTES.

The number of votes cast for each opposing candidate will be reduced proportionately as the entire vote returned for a precinct is reduced by the number of illegal votes shown to have been cast, where it is not shown for whom such votes were cast.

Information in the nature of *quo warranto* by Patrick H. O'Brien, Attorney General, on the relation of James M. Miller against Charles L. Miller to determine the right to the office of sheriff of Berrien county. Case referred to Charles E. White, Berrien circuit judge, for hearing. Submitted January 30, 1934. (Docket No. 140, Calendar No. 37,193.) Writ of ouster denied March 6, 1934.

*Patrick H. O'Brien,* Attorney General, *M. Thomas Ward,* Assistant Attorney General, and *Thomas M. Robinson,* for plaintiff.

*John J. Sterling* (*Webster Sterling, Edward A. Westin,* and *I. W. Riford,* of counsel), for defendant.

Potter, J. Information in the nature of *quo warranto* was filed in this court by the attorney general, on relation of James M. Miller of Berrien county, to inquire by what right the respondent Charles L. Miller claims to hold the office of sheriff of Berrien county. James M. Miller and Charles L. Miller were rival candidates for election as sheriff of Berrien county in the November, 1932, election. Respondent was given a certificate of election, qualified, and entered upon the discharge of his duties as sheriff. A recount of the votes in Berrien county was had prior to the issuance of the certificate of election by the board of county canvassers to respondent. Subsequently, this information was filed. Respondent denied all the material allegations of the information. No question is raised as to the sufficiency or regularity of the pleadings. This court referred the case to Hon. Charles E. White, circuit judge, to take testimony and make a report thereon with recommendations. This has been done and the case is here for final disposition.

The information attacks respondent's right to hold the office of sheriff upon the following grounds:

"(a)   On such recount, the board of county canvassers improperly and unlawfully refused to count 60 votes for relator, which votes had been duly cast in his favor in the second precinct of the first ward in the city of Benton Harbor in said county, and which had not been included in making up the total vote of said precinct through an error of the election officials thereof.

"(b)   That in the township of Oronoko in said county, there was sufficient fraud, irregularity and violation of the election laws of the State of Michigan on the part of the voters and officials of election to vitiate the entire vote of said township, said fraud, irregularity and violation of the election laws consisting of the following:

"1.   The fraudulent registration of, and voting by nonresident students in said township accounting for a total number of, to-wit: 350 illegal votes cast and counted in said election.

"2.   The fraudulent voting by persons coming to the polls on election day and casting ballots furnished by the election officials in said township, although such persons were not registered voters, nor were oaths administered to said persons before said ballots were cast, as required by law.

"3.   The illegal appointment of an unofficial person, to-wit: Lester Sunday, as inspector or clerk of said election in said township to distribute the ballots to the persons coming to the polls to vote; and said Lester Sunday did distribute such ballots illegally.

"4.   The failure of the election officials in said township to purge the vote cast in said township by eliminating 86 ballots which were cast in excess of the number of names appearing on the poll list.

"5.   The receiving and counting by the election officials in said township of, to-wit: 81 absent voters' ballots which were obtained, prepared and cast by the persons voting the same in violation of the election laws of the State of Michigan."

In relator's brief his contentions are thus stated:

"1.   Benton Harbor, first ward, second precinct.

"a.   Failure on the part of election inspectors and officials to keep a tally sheet.

"2.    Oronoko township.

"a.    Voting by persons not registered.

"b.    Absent voters' ballots received and counted by the election officials contrary to the law.

"c.    Permitting the registration and voting of nonresident students contrary to law.

"d.    Failure of election inspectors to purge the ballot box of excess ballots as required by law before tallying.

"e.    Permitting an unofficial person to distribute ballots and have access to the voters after they had received the ballots.

"f.    Complete and total disregard of the provisions of law relative to registration of electors."

In the second precinct of the first ward of Benton Harbor there was a mistake in computation of 50 votes for relator which were not credited to him by the election officials in charge. These votes relator is entitled to credit for.

It is claimed the statute, 1 Comp. Laws 1929, § 3155, which provides: "All computations and tallies shall be made upon the tally sheets used at such election," is mandatory and the failure of the election officials in that precinct to observe it vitiates the election therein and the entire precinct should be thrown out. There is no provision in the statute which excludes the vote of the precinct or says the election therein shall be void for failure to make the computations and tallies upon the tally sheets provided. The primary object of an election is to enable the voters of the precinct to express their choice of candidates. They ought not to be deprived of the right to express that choice by the fault or neglect of election officials. The authorities all recognize that fraud upon the part of the voter vitiates his ballot, but fraud or mistake on the part of the

inspectors of election should not operate to defeat the will of the voter. *People, ex rel. Hayes,* v. *Bates,* 11 Mich. 362 (83 Am. Dec. 745) ; *People, ex rel. Prosecuting Attorney,* v. *Avery,* 102 Mich. 572; *Horning* v. *Board of Canvassers of Saginaw County,* 119 Mich. 51. It is not claimed the election itself in this precinct was in any way irregular. The irregularity was in the failure of the election officers to use the official tally sheets and the mistake made in the count.

"Statutes giving directions as to the mode and manner of conducting elections will be construed by the courts as directory, unless a noncompliance with their terms is expressly declared to be fatal, or will change or render doubtful the result.    *    *    *    Before election it is mandatory if direct proceedings for its enforcement are brought, but after election it should be held directory, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or the ascertainment of the result, or unless the provisions affect an essential element of the election, or it is expressly declared by the statute that the particular act is essential to the validity of the election, or that its omission will render it void." 20 C. J. pp. 181, 182, § 223.

"Whether a statute is mandatory or directory depends on whether the thing directed to be done is of the essence of the thing required, or is a mere matter of form. Accordingly, when a particular provision of a statute relates to some immaterial matter, as to which compliance with the statute is a matter of convenience rather than substance, or where the directions of a statute are given merely with a view to the proper, orderly, and prompt conduct of business, it is generally regarded as directory, unless followed by words of absolute prohibition." 59 C. J. p. 1074, § 631.

"If, as in most cases, that statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election." McCrary on Elections (4th Ed.), § 225.

"Ignorance, inadvertence, mistake, or even intentional wrong on the part of local officials, should not be permitted to disfranchise a district." McCrary on Elections (4th Ed.), § 227.

"Those provisions of a statute which affect the time and place of the election, and the legal qualifications of the electors, are generally of the substance of the election, while those touching the recording and return of the legal votes received, and the mode and manner of conducting the mere details of the election, are directory. The principle is that irregularities which do not tend to affect results are not to defeat the will of the majority; the will of the majority is to be respected even when irregularly expressed. The officers of election may be liable to punishment for a violation of the directory provisions of a statute, yet the people are not to suffer on account of the default of their agents." McCrary on Elections (4th Ed.), § 228.

The circuit judge to whom the cause was referred found:

"We will first take up the allegation that relator should be credited with 50 additional votes from the second precinct of the first ward of the city of Benton Harbor. It appears from this record that, in counting the ballots in this precinct, the election board did not strictly comply with the statute, and did not use the regular tally sheets in computing the

vote. In making their return, the election board from this precinct returned the tally sheets in blank. It appears that, in counting the votes in this precinct, the ballots were divided up among the members of the board; two members working on each pile of ballots, and counting them; that they kept the record of their count, or the tallies, on separate sheets of paper, which were later destroyed; that, after the count was completed, the total number of votes received by each candidate from each pile of ballots was assembled on another sheet of paper, and then footed up, and from that footing the statement of votes for the respective candidates was made up and returned. This last sheet of paper was preserved, and has been offered in evidence as relator's exhibit 7. The number of votes as being returned by the board as being cast for relator James M. Miller was 311. A correct footing, however, of the vote as shown on exhibit 7 shows it to have been 361. I am, therefore, satisfied that a mistake was made in returning the number of votes cast for relator in this precinct, and that he actually received in this precinct 361 votes, instead of 311. The relator, therefor, must be credited with these 50 votes.''

It does not appear from the information any direct specific charge of illegality in the election in this precinct was made, on the ground the election officers failed to use the official tally sheets. The circuit judge to whom the case was referred, however, notices that fact. Respondent claims the question is here raised for the first time. This case was instituted in this court. It is an appeal to the court's original jurisdiction conferred by the Constitution (Const. 1908, art. 7, § 4). Relator must raise the question in this court or not at all. It should have been raised by the pleadings, but treating it as properly raised, and the information as so amended as

to permit it to be raised, we think it cannot avail relator because the failure to use the official tally sheets was not a violation of the mandatory provisions of the statute.

In Oronoko township many irregularities are charged to have occurred. It is contended they are of such a character as to vitiate the election in this precinct and the vote of the entire township should be thrown out and disregarded.

It is claimed an unofficial person, one Mr. Sunday, was permitted to distribute ballots and have access to the voters after they had received the ballots. The supervisor (republican) testified:

"He was one of the inspectors, around inside of the rail and helped the voters get their ballots. He showed them to their booths—which ones were empty. He did not assist anybody in voting. To my knowledge he did not distribute ballots to them. He did not act as one of the inspectors and write down their names on the poll book. He did not go into the booths. Helped them into the booth but he did not go into the booth; if they needed assistance he was inside the rail, assisting around there generally."

Mr. John Mordock (democrat), clerk at the election, testified:

"Lester Sunday was the bookkeeper at the bank. The board put him on to kind of keep the voters moving. There was a big vote and they had to keep them moving; not to spend too much time in the booth because they didn't have accommodations. He was around, I guess he was sworn in as an inspector. I don't know that for sure, the book will show that. He might have passed out some ballots

inside the railing but not in the booths any time that I know of.''

The circuit judge to whom the case was referred found, and the evidence supports his finding:

''It appears that one Lester Sunday was sworn in as some kind of an election officer. Mr. Eidson, the supervisor, insists that he was sworn in as an inspector. From the oath that was administered to him, it is marked at the top as assistant gatekeeper, but in the oath itself it does not appear for what office he was taking the oath. The record does not disclose, however, that he took any active part in conducting the election, except to assist in getting the voters in and out of the polling place. He assisted no one to vote, did not go into any booths, had no active part in providing the voters with their ballots, or otherwise took part in conducting the election. I cannot find, therefore, that there was any impropriety in what he did. No doubt, it was found necessary, because of the large number voting to have someone present to assist in getting the voters in and out of the polling place.''

Apparently Mr. Sunday was authorized by the election officials to act. Perhaps they were negligent in not clearly designating in the official oath which he signed his precise office. He was acting with the consent of the election officials under color of authority. It does not appear that anything which Mr. Sunday did in any way influenced the action of any voter or the result of the election. There may have been technical irregularity in the oath taken by him. The election officers ought to have been more careful in seeing that he took the prescribed oath for a specific office, but we think, neither their failure to do so, nor any act shown to have been done by Mr. Sunday in any way affected the result.

It is claimed by relator the election inspectors did not properly purge the ballot box of excess ballots before beginning the count.

Section 3152, 1 Comp. Laws 1929, provides:

"Immediately on closing the polls, the board of inspectors of election in each precinct shall proceed to canvass the votes. Such canvass shall be public and shall commence by a comparison of the poll lists and a correction of any mistakes that may be found therein until they shall be found or made to agree."

Section 3153, 1 Comp. Laws 1929, provides:

"When the board is ready to proceed with the counting of any kind of ballots, the box containing such ballots shall be opened and the whole number of ballots counted. If the ballots shall be in excess of the number of the electors voting according to the poll lists, the ballots shall be replaced in the box and one of the inspectors shall publicly draw out and destroy so many ballots therefrom unopened as shall be equal to such excess."

The circuit judge to whom the cause was referred found:

"As to the claim that, when the ballot box was opened, at the close of the election, more ballots were found therein than appeared on the poll book, it is not substantiated by this record. This claim is founded upon the figures upon the wrappers that were put around the ballots after they had been counted and sealed up. I ordered the ballot box opened, so that these wrappers might be inspected and read into the record. From these exhibits, it appears that upon one wrapper it was marked '531 republican votes,' upon another wrapper '416 democratic votes,' upon another '611 split votes,' and upon another 'prohibition 4, socialist 1, proletarian 6 and blank 4.' This would make a total of 1,573 ballots, while the poll list only shows 1,488. This

record, however, shows that whoever placed these numbers upon these wrappers must have made a mistake on some of them. The poll book calls for 1,488 ballots. The testimony of the election officials shows that, when they opened the ballot box, and counted the ballots, there were 1,485 ballots; that later on an additional ballot was found in with the amendments, making 1,486. The record also shows that 83 absent voters' ballots were sent out, and two were not returned. This would make up the 1,488 ballots called for by the poll book. The record also discloses that there was delivered to Oronoko township 1,700 ballots. When the ballot box was opened, in my presence, it showed unused ballots as follows: 1,489 to 1,500 inclusive, which had been initialed by the election inspector, and not used; ballots 1,500 to 1,700 unused and uninitialed. The testimony of Mr. Myers, who initialed the ballots, also corroborated this. It therefore clearly appears that all of the 1,700 ballots delivered to Oronoko township have been accounted for, namely: 1,486 ballots cast and counted; 2 absent voters' ballots not returned; ballots 1,489 to 1,500 initialed, unused and now in the ballot box; and ballots 1,500 to 1,700 are unused, uninitialed and now in the ballot box.

"I must, therefore, find as a matter of fact that whoever placed the figures of the number of ballots on the wrappers made a mistake, and that no excess number of ballots were in the ballot box."

There being no excess ballots in the ballot box the election officials were not called upon to purge the ballot box of excess ballots as provided in 1 Comp. Laws 1929, § 3153, above quoted.

There are other irregularities which must be considered. It is claimed by relator that a number of absent voters' ballots were cast by persons who ought not to have been permitted to cast such ballots; a number of students at the college at Berrien Springs voted who were not residents of the town-

ship of Oronoko and a number of persons were permitted to vote who were not registered.

Section 3136, 1 Comp. Laws 1929, as amended by Act No. 200, Pub. Acts 1931, prescribes the time and manner of making application for an absent voter's ballot and the form therefor.

Section 3137, 1 Comp. Laws 1929, provides for filing by the clerk of the township of a record of applications received, the ballots mailed out and the date of receiving the ballots of such voters.

Section 3138, 1 Comp. Laws 1929, provides for mailing the ballots and the return envelope in which the ballot is to be returned, and the signature of the absent voter.

Section 3141, 1 Comp. Laws 1929, as amended by Act No. 282, Pub. Acts 1931, provides for mailing to each absent voter separate printed instructions to be furnished by the county clerk.

Section 3142, 1 Comp. Laws 1929, as amended by Act No. 282, Pub. Acts 1931, provides for marking, folding and mailing by the absent voter of such absent voter's ballot.

Section 3143, 1 Comp. Laws 1929, as amended by Act No. 282, Pub. Acts 1931, provides for safekeeping of such mailed ballots, inspection of and list of applications for absent voters' ballots, filing of such ballots and the use thereof on election day.

Section 3144, 1 Comp. Laws 1929, prescribes the duty of inspectors of election in verifying the legality of such absent voters' ballots.

Section 3145, 1 Comp. Laws 1929, governs the duty of election officials as to absent voters' ballots found to be illegal.

Section 3146, 1 Comp. Laws 1929, provides for voting of such legal ballots.

In this election precinct, absent voters' ballots were voted that ought not to have been voted. It

appears from the testimony, the voting of these irregular absent voters' ballots was not confined to the members of any political party. A lax compliance with the provisions of the statute regulating the right of absent voters to vote, seems to have been practiced in the election district by the members of both political parties whose candidates are parties to this contest.

"So far as the record shows both parties may have received votes thereby. If it be further assumed, as plaintiff contends, that the activities producing the irregularities were in aid of defendant's candidacy, and that he received full benefit thereof, it makes no difference, for if all these ballots were thrown out, still defendant's 'majority would be so great that the result would not be in any way adversely affected,' as held by the trial judge." *Sturdevant* v. *Stevenson,* 261 Mich. 466.

The circuit judge found:

"The record shows that, in certain cases, individuals were permitted to take out applications for absent voters' ballots, and to have them signed by the applicant, and then return and file the application with the township clerk, and receive the ballot, and then take the ballot to the voter, and after the ballot was voted, return it to the clerk. This, of course, was a violation of the statute. It appears, however, that these practices were indulged in by the members of both political parties, and such had been the practice in that township at prior elections. This, of course, does not make it legal, or justify it, but it does show that the election officials were not acting corruptly, or in bad faith, or with any intent to commit an active fraud. In fact, the record shows, as to all irregularities claimed by relator, that they had been indulged in, not only at this election, but the prior elections by the members of both political parties. Apparently, the township officials in this town-

ship were not aware that these practices were a violation of the statute, and they were engaged in more or less for the accommodation of the voters themselves, who .desired to vote absent voters' ballots. There were 83 applications for absent voters' ballots, and they have all been offered in evidence. From an inspection of these applications it appears that there are a large number of irregularities in them. Some of them are not properly witnessed, and others do not disclose the reason for applying for them. In no case, however, does it appear from the record that any person, applying for an absent voter's ballot, was not entitled to receive one. No doubt, the requirements of the statute are mandatory, so far as they apply to the delivery of the ballot to the voter, and the return of the ballot to the clerk, after it has been voted. This provision has to do with the secrecy and purity of the ballot, but it may well be doubted whether an irregularity in the filling out of the application would invalidate the ballot, unless it appeared that the voter was not entitled to receive the ballot. What I have said so far has been intended to refer to the question of whether or not there appears any active or intentional fraud on the part of the election officials, such as would affect the entire ballot in the township, and entitle the relator to have it thrown out. In my judgment, no such actual or intentional fraud has been shown."

The findings of the circuit judge are amply sustained by the record.

It is claimed a large number of students attending the local college at Berrien Springs were permitted to vote when not actual residents of the township.

Article 3 of the Constitution of 1908 governs the exercise of the elective franchises. Section 2 of article 3 provides:

"No elector shall be deemed to have gained or lost a residence by reason of his being employed in the

service of the United States or of this State, nor while engaged in the navigation of the waters of this State or of the United States or of the high seas, nor while a student at any institution of learning, nor while kept at any almshouse or other asylum at public expense, nor while confined in any public prison; except that honorably discharged soldiers, seamen and marines who have served in the military or naval forces of the United States or of this State and who reside in soldiers' homes established by this State may acquire a residence where such home is located.''

The language of this provision of the Constitution has been frequently before the court. *People, ex rel. Twitchell,* v. *Blodgett,* 13 Mich. 127; *Warren* v. *Board of Registration,* 72 Mich. 398 (2 L. R. A. 203); *Wolcott* v. *Holcomb,* 97 Mich. 361 (23 L. R. A. 215); *People* v. *Osborn,* 170 Mich. 143 (40 L. R. A. [N. S.] 168); and similar provisions are discussed in 20 C. J. p. 72. The constitutional provision is plain and unambiguous so far as students are concerned. No elector shall be deemed to have gained or lost a residence ''while a student at any institution of learning.''

The great weight of authority is that, ''a student at college who is free from parental control, regards the place where the college is situated as his home, has no other to which to return in case of sickness or domestic affliction, is as much entitled to vote as any other resident of the place where the college is situated.'' 20 C. J. p. 72.

''I apprehend that if a young man of full age was sent to college by his father, never having acquired a residence apart from that of his father, and if his father and family should, in good faith for the purpose of establishing their family domicile there, take up a residence in the college town where he was a

student there, he would thereby gain a residence as an elector. In such a case he would gain a residence '*while* a student at an institution of learning;' but the fact that he was a student would be a circumstance of no importance in determining residence. So if the family of such a young man should remove from one place to another in the State, I apprehend that he might register and vote as an elector in the community in which his father lived. In such a case, he would both lose and gain a residence '*while* a student at an institution of learning.' A construction of the Constitution which would deny him the right to reside where his father resided, and the right to gain a residence elsewhere, 'while a student,' would involve disfranchisement. The law will not permit students at institutions of learning, by any declaration of intention, to become electors in the communities in which such institutions are situated. But if respondent, having no domicile, in good faith made a domicile at Albion, entering college as a resident citizen of Albion, he was entitled to vote there." *People* v. *Osborn, supra,* 148.

The circuit judge said:

"It also will appear hereafter that certain students from Emanuel Missionary College were permitted to cast their ballots. It now appears from this record that some of them at least were probably illegal voters, but there is nothing to show that the election board were not acting in entirely good faith in receiving their ballots. In some cases, it is difficult even for me to determine whether or not the particular student involved was legally entitled to vote in Oronoko township. * * * There were 58 ballots cast by persons connected with the college. The majority of these 58 on this record were clearly entitled to vote under the rule laid down in *People* v. *Osborn,* 170 Mich. 143, but for the present purpose, we will assume that all of the 58 ballots should be rejected."

In the recommendations made by the circuit judge, he treated the whole number of votes cast by persons connected with the college as invalid.

It is also claimed certain persons who were unregistered were permitted to vote.

Section 2756, 1 Comp. Laws 1929, provides the inspectors of election, "shall not receive the vote of any person whose name is not registered in the registration book of the precinct in which he offers to vote."

Section 2757, 1 Comp. Laws 1929, provides:

"Every person who has the constitutional qualifications of an elector, or who will have such qualifications at the next ensuing election or primary election, shall be entitled to be registered as an elector in the voting precinct in which he resides."

Section 2758, 1 Comp. Laws 1929, provides for keeping a registration book.

Section 2759, 1 Comp. Laws 1929, prescribes the form and contents of the registration book.

Section 2762, 1 Comp. Laws 1929, provides for custody of the registration book.

Section 2763, 1 Comp. Laws 1929, provides for delivery by the custodian of the registration book, of the same, to the inspectors of election for use during such election, and for its return to its proper custodian.

Sections 2770–2773, 1 Comp. Laws 1929, provides for personal application by persons seeking registration, registration, examination of the applicant for registration, registration on election day and on the last Saturday preceding election, and for the duties of the registration officials and penalties for a violation of the registration statutes.

Unregistered voters were permitted to vote in violation of the statute. In *People, ex rel. Foley,* v.

*Kopplekom,* 16 Mich. 342, a large number of unregistered persons voted. There was no acting board of registration and the question for consideration was whether the votes of these unregistered voters were legally cast. The court said of the registration statute:

"It does not speak the language of a mere offer, or proposition to the electors, to register or not, but utters the language of law; unconditional, absolute, imperative; and declares that all who do not register shall not vote."

The court held:

"That those votes upon which the relator has based his claim were given and received in plain violation of law, and were consequently void."

The votes given by persons not registered were received in violation of law. Such votes were illegal and may not be counted.

In *Attorney General, ex rel. Seavitt, Jr.,* v. *McQuade,* 94 Mich. 439, the court held the rule laid down in Paine on Elections, § 499, and McCrary on Elections, §§ 190–192, founded on good sense and sustained by the authorities. The rule was:

"When fraud on the part of the officers of election is established, the poll will not be rejected, unless it shall prove to be impossible to purge it of the fraud. When the result at a poll, as shown by the returns, is false and fraudulent, and it is impossible to ascertain the actual vote from the other evidence in the case, the vote of such poll must be wholly rejected."

"The electors are not to be deprived of the result of their votes at an election by the mistake of election officers, when it does not appear to have changed the result." *People, ex rel. Prosecuting Attorney of Oceana County,* v. *Avery,* 102 Mich. 572.

"To warrant setting aside the election, it must appear affirmatively that the successful ticket received a number of improper votes, which, if rejected, would have brought it down to a minority." COOLEY, C. J. *People, ex rel. Williams,* v. *Cicott,* 16 Mich. 283 (97 Am. Dec. 141).

In *Attorney General, ex rel. Reynolds,* v. *May,* 99 Mich. 538 (25 L. R. A. 325), the court charged the jury:

"If illegal votes were received, and the evidence does not show in whose favor the illegal votes were cast, and they are as great in number as the majority received in that voting district, then the election in the district shall be thrown out and disregarded by you. If the evidence does not disclose for whom such illegal votes were cast, and they are less in number than the majority in that voting district, then they should be taken from the total vote proportionately, according to the entire vote returned for each candidate in that precinct."

The court did not pass directly upon the correctness of this instruction but said:

"In the present case the inspectors and other officers of the various districts are not charged with active fraud, but with marking ballots of those who claimed they could not read English without their having first made oath as to that fact. This may have arisen from the interpretation of the statute now claimed by respondent's counsel; that is, that such provisions are not mandatory, but directory merely. And, again, it appears that proofs were obtainable and actually introduced as to the number of electors whose ballots were so marked. This would not, under the facts shown, necessarily taint the vote of the whole district, and it would not taint the whole ballot if the jury were able to determine the correct ballot, as, under such circumstances, it would not destroy the presumption of the correctness of the other ballots cast."

In passing upon the charge of the trial court where in substance the jury were directed they should take the illegal votes from the total vote proportionately according to the entire vote returned for each candidate in that district, the court said:

"In this we think the court, under well-settled rules, was entirely correct. It is a fair way to arrive at results. The rule is based upon the proposition that the illegal votes have gone into the boxes without the fault of either candidate. If these illegal votes can be separated from the legal ones, so that the number is substantially ascertained, then the poll is too large by exactly that number, and they must be cast out. In casting them out, the rule laid down by the court below is sustained by McCrary on Elections (3d Ed.), § 460, where it is said:

" 'Of course, in the application of this rule such illegal votes would be deducted proportionately from both candidates, according to the entire vote returned for each.'

"In 6 Am. & Eng. Enc. Law (1st Ed.), p. 353, it is said:

" 'Where more ballots are found in the ballot-box than there are names on the poll list, the statutes of many of the States require the officers of election to draw out enough ballots, without seeing them, to make the number equal to that of the voters. And, where they have not done this, it is probable that no other mode would be preferable to that of deducting from each candidate a number of votes proportioned to his total vote compared with the aggregate vote of the precinct;' and the following cases are cited: *Gibbons* v. *Sheppard*, 2 Brewst. 1, 128; *Finley* v. *Walls*, 4 Cong. Elec. Cas. 367; *Platt* v. *Goode, Id.* 650.

"Our statute (section 174, How. Stat.) provides:

" 'If the ballots in the box shall be found to exceed in number the whole number of names of electors on the poll lists, they shall be replaced in the box, and one of the inspectors shall publicly draw out and destroy so many ballots therefrom, unopened, as shall be equal to such excess.'

"Mr. Justice COOLEY, in speaking of this provision of the statute in *People* v. *Cicott, supra,* says,

" 'As each ballot is usually one of a number designed to be allowed to particular candidates, and counted against others given to other candidates, the drawing may still work no injustice, since each candidate will probably lose by it a number proportioned to the relative number of ballots appearing for him in the box, and thus the relative proportions will be preserved.'

"This rule, he says, 'is based upon the doctrine of probabilities.' While we have no statute directing the mode of apportionment laid down by the court below, yet the rule, we think, is one which does no injustice to either candidate, and in the end carries into effect, as nearly as may be, the will of the people as expressed at the polls."

The circuit judge held, under the rule of the *May Case* above quoted, the entire vote of Oronoko township should not be cast out but the court should reject the illegal ballots, the number thereof having been ascertained by the evidence. He found no active or legal fraud had been shown by the evidence; the election officers appeared to have acted honestly and in good faith; their illegal acts could affect only the illegal ballots involved; the number of illegal ballots, giving relator's testimony its most favorable consideration, was 187, while respondent's returned majority in the township was 293. Under all the facts the circuit judge rejected 58 ballots of persons connected with the college, 48 non-registered ballots and 81 absent voters' ballots, making a total of 187, and apportioning these illegal ballots in accordance with the rule of *Attorney General, ex rel. Reynolds,* v. *May, supra,* he deducted from relator's vote 74 and from respondent's vote 113, thus leaving the respondent with a majority in the entire county of 30 votes, and therefore recommended no writ of ouster be issued to relator.

We do not approve the method in which the election was conducted in Oronoko township. After a careful examination of the record we believe the circuit judge to whom the case was referred arrived at a correct conclusion. His recommendations are approved and the writ of ouster is denied.

Nelson Sharpe, C. J., and North, Fead, Wiest, Butzel, Bushnell, and Edward M. Sharpe, JJ., concurred.